THE MAREN LEE. THE HERMAN LEE. CONSOLIDATION COASTWISE
CO. v. LEE TOWING LINE, Inc., et al.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

Nos. 97, 98.

1. **Collision ⊙⇒115—Tug is liable for her fault, which caused collision by tow.**

Where a tug, which was made fast to the starboard quarter of a schooner, was at fault for going astern when the schooner took a sheer to starboard, which resulted in a collision, the tug is liable in rem for the resulting damages, though her master, who gave the wrong order, was acting as pilot of the schooner.

2. **Pilots ⊙⇒2—Tug master on vessel, directing course in attempt to follow tug, is "pilot."**

The master of a tug, who was stationed on the deck of a schooner in tow, directing her course merely in an endeavor to make her follow another tug, which was towing ahead, was a "pilot," which is the term applied to the officer on board a ship having charge of the helm and of the ship's route, or to a person taken on board at a particular place for the purpose of conducting a ship through a river, road, or channel, or from or into a port.

[Ed. Note.—For other definitions, see Words and Phrases, Pilot.]

3. **Collision ⊙⇒115—Vessel is liable for wrong order of contractual pilot.**

Where the pilot in charge of a vessel, whose negligent orders resulted in the collision, was not a compulsory pilot, but one voluntarily accepted as the result of a contract, the vessel is liable in rem.

4. **Collision ⊙⇒115—Value of tug, whose master was at fault, exhausted before recourse to tow.**

Where a collision resulted from the negligent order of a tug master, who was on the schooner in tow at the time, under circumstances making both vessels liable in rem for the resulting damages, the value of the tug, whose master caused the collision, should be first exhausted before recourse is had to the tow.

Appeals from the District Court of the United States for the Southern District of New York.

Libels in admiralty by the Consolidation Coastwise Company against the steam tugs Maren Lee and Herman Lee, the Lee Towing Line, Inc., claimant, and against the schooner Cora F. Cressy, Samuel R. Percy, claimant, and by Samuel R. Percy against the steam tugs Maren Lee and Herman Lee, the Lee Towing Line, Inc., claimant, and against the steam tug Cumberland and the barge No. 18, the Consolidation Coastwise Company, claimant. From a decree adjudging the tug Herman Lee and the schooner Cora F. Cressy liable for the damage, the Lee Towing Line, Inc., appealed. Affirmed.

The schooner Cora F. Cressy lay at the Staten Island anchorage on a fair and clear day in April. She is a large five-masted vessel, and drew on the day in question, partly loaded, 24 feet. She employed the Lee Towing Line to take her through the East River, and the two tugs Maren and Herman Lee were assigned to do the work. The larger tug (Maren Lee) took position ahead with the usual towing line, the Herman Lee made fast on the starboard quarter of the schooner, and the flotilla started, entering the East River through Buttermilk Channel. There was a strong flood tide in the river, and the tugs attained considerable speed, it is said as much as seven miles an hour. At the same time the tug Cumberland, with two light barges in tow

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on short hawsers, was coming down the river on a voyage from Boston to Baltimore. Congestion of shipping compelled the Cumberland to get over on the Brooklyn side of the East River approximately in the neighborhood of Manhattan Bridge, at the time when the Maren Lee was passing or about to pass under the Brooklyn Bridge.

The master of the Herman Lee left his tug on the schooner's starboard quarter and took position on the latter vessel's forecastle head. The schooner's master was not aboard; she had two mates, however, of whom the senior was forward with the tug captain, and the second aft, in such a position that he could see what the man at the wheel was doing and give him orders, if necessary. The tug captain went on the schooner's forecastle head, because he thought that the best place to give orders, not only to the man at the wheel of the schooner, but to his own tug, to the end that the long, and heavy tow might follow the Maren Lee properly. The tug master gave orders for the schooner's helm by waving his arm, though by some of the evidence he either also gave oral commands, or the schooner's officers translated the tug master's arm wave into words, and so passed the command to the wheelsman.

Between the Brooklyn and Manhattan Bridges the Maren Lee and her tow were obliged to pass the Cumberland and her tow starboard to starboard. As they were about to pass, the schooner sheered suddenly toward the Brooklyn shore, and with such violence that the Maren Lee was unable to check the sheer before the schooner came in contact with one of the Cumberland's barges, injuring both vessels. At the time of collision the Cumberland and tow were within less than 100 feet of the Brooklyn pierhead line. While going through Buttermilk Channel the schooner had manifested a tendency to sheer; whether she again sheered, and toward Brooklyn, when approaching the Cumberland, is not clear, but probable; but the immediate cause of collision was that the helm of the schooner was so moved as to direct her course toward Brooklyn, while at the same time, according to his own evidence, the tugmaster ordered his own vessel, the Herman Lee, to go "hard astern and hook her up again."

At or just before the moment of collision the helm of the Cressy was hard aport and the tug on her starboard quarter was backing strong. The owners of both injured vessels filed libels against all the other parties concerned. The lower court exonerated the Cumberland and the Maren Lee, adjudging that all the resulting damage should be borne by the Herman Lee and the Cora F. Cressy. The only appeal was taken by the owner of the Herman Lee, but in this court the owner of the Cressy reasserts the schooner's freedom from blame.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and Robert S. Erskine, both of New York City, of counsel), for the Herman Lee.

Carter & Carter, of New York City (Peter S. Carter, of New York City, of counsel), for the Cora F. Cressy.

Barry, Wainwright, Thacher & Symmers, of New York City (James K. Symmers, of New York City, of counsel), for the Cumberland and her tow.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] This collision was singularly inexcusable; in investigating accidents of this class, one piece of gross negligence is usually discovered. In commenting on the evidence, an experienced trial judge said that he found the captain of the Herman Lee "untrustworthy, not only in his report to the local inspectors, which is extremely uncandid, but also in his conflicting stories of the orders given to his tug." We entirely agree with this estimate of the witness, and find that the main responsibility for

collision rests on him. We further agree that the Maren Lee, the Cumberland, and the latter's tow were wholly without fault. The Cumberland was excused by the exigencies of navigation in going down the river near the Brooklyn shore; there was plenty of room for the schooner and her tugs to pass starboard to starboard, and if the schooner had followed straight after the Maren Lee (which vessel was laying a proper course) there would have been no collision.

It is quite probable that the root of the difficulty was that the tug master on the forecastle head faced aft and attempted to give his steering orders by waving his hand in the direction that he wished the schooner's head to turn. It is the historic rule of the sea that orders are always given to the helm, and it may be true that, when the tug captain waved his hand to port, the signal was interpreted as meaning to put the helm to port. But, however this may be, no excuse can be suggested for ordering the tug on the starboard quarter to go astern as hard as she could, when a sheer toward Brooklyn was developing, no matter what the cause of the sheer. This was the commission of a marine tort on the part of the helper tug Herman Lee, and is sufficient to hold her in rem.

[2] So far as the liability of the schooner for injury to a third party —i. e., the Cumberland's barge—is concerned, it makes no difference whether the sheer toward Brooklyn which brought about collision was caused or contributed to by a wrong order from the tug master or a wrong understanding of that order, if that tug master was a pilot. He was, of course, a pilot in the sense that he was a licensed man; but the question is whether, when performing so humble a duty as merely trying to keep the schooner straight behind the Maren Lee, he was acting as a pilot.

"The name of pilot or steersman * * * 'is applied either to a particular officer serving on board a ship during the course of a voyage, and having the charge of the helm, and of the ship's route, or to a person taken on board at a particular place for the purpose of conducting a ship through a river, road, or channel, or from or into a port.'" The Wave v. Hyer, Fed. Cas. No. 17,300, 2 Paine, 131.

"The term pilot is equally applicable to two classes of persons, to those whose employment is to guide vessels in and out of ports, and to those who are entrusted with the management of the helm and the direction of the vessel on her voyage." Pacific Mail, etc., v. Joliffe, 2 Wall. 461, 17 L. Ed. 805.

Within these authoritative definititions it is plain that in the legal sense the master of the Herman Lee was acting as pilot of the Cressy when directing, or attempting to direct, her course, even though that course was but the wake of a towing tug.

[3] He was not a compulsory pilot, but one voluntarily accepted as the result of contract. Wherefore, if he gave a wrong order, which caused or contributed to collision, the Cressy is liable as the offending res (Homer Ramsdell, etc., Co. v. La Compagnie Générale, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155, and cases cited); whereas, if he gave a proper order (which we do not believe he did), and that order was misunderstood by the ship's officers and/or the man at the wheel, the schooner is also liable, though for another reason.

[4] It is evident from the apostles that the liability of the Cressy

is important, because the Herman Lee is not sufficiently valuable to cover all the damage. As we have found that a wrong order given by the master of the Herman Lee was the proximate cause of collision, it was correct (as was done in the court below) to order that the value of the Herman Lee should be first exhausted before recourse was had to the Cressy.

Decree affirmed, with the costs of this court to the Consolidation Coastwise Company only.