285 F.2d 336
 Frank SAVAS, Individually and trading as World Wide
Engineering Company, Libellant, Appellee,
v.
MARIA TRADING CORPORATION, Impleaded Respondent, Appellant,
Frank SAVAS, Individualy and trading as World Wide
Engineering Company, Libellant, Appellant,
v.
THE Steamship CAPT. JOHN C., her boilers, engines, tackle,
apparel and furniture, in rem, Respondent, Appellee.
 No. 8137.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 14, 1960.
Decided Dec. 16, 1960.
 
 Carter B. S. Furr and John W. Winston, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for libellant Frank Savas.
 Francis N. Crenshaw, Norfolk, Va. (Baird, Creshaw & Lanning, Norfolk, Va., on brief), for impleaded respondent Maria Trading Corp.
 Hugh S. Meredith, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for respondent S.S. The Capt. John C.
 Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 This appeal is taken by Frank Savas, a maritime surveyor, from a decree of the district court in admiralty which denied him a maritime lien against the SS Capt. John C for services rendered to the vessel in Bremen, Germany. Maria Trading Corporation, a Panamanian corporation, formerly owner of the ship and an impleaded respondent in the case, also appeals from an in personam decree against it.
 
 
 2
 Savas filed a libel in rem against the ship on August 10, 1956, as she lay in the Norfolk harbor, claiming compensation for services to the ship in three transactions, as follows:
 
 
 3
 (1) a claim for labor performed, materials furnished and services rendered at Norfolk, Virginia, from August 24, 1955 to September 1, 1955, in the sum of $1780.00;
 
 
 4
 (2) a claim for labor performed, materials furnished and services rendered at Baltimore, Maryland, from August 16, 1955 to October 21, 1955, in the sum of $2560.00; and
 
 
 5
 (3) a claim for services rendered in the supervision of repairs, transportation and subsistence expenses of the libellant and cash furnished by him for miscellaneous purposes in connection with the ship at Bremen from November 17, 1955 to February 29, 1956, in the sum of $10,182.22.
 
 
 6
 By the final decree the in rem claims of the libellant against the ship in the first two transactions were allowed but the in rem claim on the third transaction was denied. However, a decree in personam in his favor was given against the Maria Trading Corporation and a decree in favor of Associated Bulk Cargo S.A., the owner of the ship when the libel was filed, was awarded against Maria Trading Corporation for a judgment over; and these in personam claims were referred to a commissioner to hear proofs as to Savas' claim for services performed and expenses incurred in the Bremen transaction, and the commissioner was directed also to consider the claim of Associated Bulk Cargo for such detention damages as may be shown by the evidence and report to the court thereon. Appeals from the adverse judgments were taken as aforesaid.
 
 
 7
 Little need be said about the Norfolk and Baltimore claims of Savas since it is conceded that the work performed at these ports would 'under normal circumstances support a maritime lien.' The appeal by Maria Trading as to these claims rests only on the contention that Savas had an 'ownership interest' in the ship inconsistent with the existence of a maritime lien. The facts in relation to this contention must be considered, since they have a bearing not only on the Norfolk and Baltimore transactions but also on the Bremen transaction.
 
 
 8
 Prior to the transactions which gave rise to the claims in suit, to wit: on May 27, 1955, George Stathos, a friend of Savas, entered into an agreement with William F. Murphy, Jr., the owner of all the stock of the Maria Trading Corporation, to purchase the stock for the sum of $340,000, of which $10,000 was to be paid upon the signing of the agreement, $25,000 on June 3, 1955, $15,000 on June 30, 1955, the balance to be paid out of the earnings of the ship, which were to be collected by the Gallie Corporation, the operating agent of the ship occupying offices with the Maria Trading Corporation in New York. The agreement provided that the stock should be held in escrow until the purchase price was paid in full and that in the meantime Murphy should have the right, in case Stathos was in default, to sell the vessel to anyone else, if the net proceeds of sale exceeded the indebtedness, in which ase the proceeds were to be used to pay the indebtedness and credited to Stathos' account. By subsequent agreement of November 18, 1955, the distribution of the proceeds in case of a sale to a third party was somewhat modified.
 
 
 9
 Stathos made the initial payment of $10,000 and borrowed $25,000 from Savas to make the second payment. At or about this time Stathos, Savas and one Kirkilies entered into an agreement whereby Stathos agreed to sell 25 per cent of the stock of the corporation to Savas for $25,000 and 10 per cent to Kirkilies for $10,000. This agreement, however, was never consummated since on July 17, 1956, after all the work involved in the three transactions had been performed and before the libel was filed, Murphy exercised the privilege retained by him and sold the ship to the Associated Bulk Cargo S.A. The new purchaser came into the pending case as claimant of the vessel and on August 6, 1957, filed an impleading petition alleging that it had purchased the ship from the Maria Trading Corporation in a bill of sale under which that corporation undertook to convey good title to the vessel, free and clear of liens, and praying that a decree might be entered against it for the amount of any liens imposed upon the vessel and also for detention damages.
 
 
 10
 We are in accord with the conclusion of the district judge that under these circumstances Savas had no ownership in the vessel inconsistent with the maintenance of a maritime lien for services rendered. He was employed at Stathos' request with the expectation that he would acquire an interest in the vessel upon the consummation of the agreement of sale between Murphy and Stathos; but, as we have seen, the vessel was sold to another party and Savas never became a stockholder in the corporation which owned her.
 
 
 11
 It follows that, insofar as the Savas lien claims are concerned, we need give further consideration only to the dismissal of the lien claim for services rendered by him in Bremen. The district judge held that Savas was not entitled to a lien for these services because he was acting as the owner's representative in Germany and not as a marine surveyor or independent contractor. We are in agreement with this conclusion. While it is provided by 46 U.S.C.A. 971 that a person furnishing repairs or supplies to a vessel upon the order of the owner or his agent is entitled to a lien upon the vessel, it is established by the decisions of the courts that a general agent of the owner has no lien for services rendered, the theory being that he acts not as a stranger relying on the security of the vessel but as an agent of the owner to whom he looks for payment. The Centaurus, 4 Cir., 291 F. 751; The Maret, 3 Cir., 145 F.2d 431; Todd Shipyards Corp. v. City of Athens, D.C.Md., 83 F.Supp. 67, affirmed Acker v. City of Athens, 4 Cir., 177 F.2d 961; The Ascutney, D.C.Md., 278 F. 991; The Gyda, D.C.Me., 235 F. 266; The Owego, D.C.E.D.La., 292 F. 403.
 
 
 12
 Savas was not such a general agent of the ship as the Gallie Corporation which operated her from its New York offices, but the evidence clearly shows that he performed his services in Bremen, not as a stranger to the ship, but as an employee of the Gallie Corporation to which he looked for compensation. After the work in Baltimore was finished the ship sailed for Germany and suffered heavy storm damage on the way which necessitated considerable repair work before she could sail from Bremen. On this account the Gallie Corporation employed Savas at wages on a per diem basis to go to Bremen and supervise the repairs that were to be made in the German shipyard. He was instructed to supervise the work and do all that was necessary to have the vessel put in seaworthy condition. He was furnished with a general letter of introduction in which he was designated as port engineer for the Gallie Corporation with authority to supervise repairs. The German agents for the ship were notified that Savas and no one else was in charge of the repairs, with power to authorize disbursements. While Savas was in Bremen cables passed between him and the Gallie Corporation indicating that he was acting as the owner's representative. Additional testimony on behalf of the owner of the ship indicated the distinction between the services rendered by Savas in the United States and those rendered by him in Germany. In Norfolk and Baltimore, Savas furnished the labor and materials necessary to repair the ship and performed the work as an independent contractor, while in Bremen the work was actually done by the local shipyard under his general supervision as the representative of the owner. The items of the Norfolk and Baltimore claims consist of charges for money expended by Savas for the work done and materials furnished by him, while the Bremen claim consists mainly of a per diem charge of $75.00 for personal services with miscellaneous charges of cash advanced and travel expenses incurred, less cash advanced by the Gallie Corporation and the proceeds of the sale of ship equipment which Savas undertook to sell for the owner in Germany. The situation in its entirety justified the finding of the district judge that Savas looked to the owner and not to the ship for the work done by him in Germany.
 
 
 13
 Maria Trading's opposition to the decrees in personam against it rests on the contention that it came into the case only to challenge the existence of the maritime liens and hence the court had no power to hold it personally liable either to Savas or Associated Bulk. Maria Trading made no appearance in the case until a year after the libel was filed on August 10, 1956. Associated Bulk promptly laid claim to the ship through the captain when the libel was filed, and secured the release of the ship by filing a bond. It also filed an answer to Savas' libel and cross-libel in which it alleged that Savas was not entitled to a lien against the ship and claimed damages against him for the unlawful detention of the ship.
 
 
 14
 In August 1957, Associated Bulk determined to file an impleading petition against Maria Trading under Admiralty Rule 56 in order to make it a party to the case and require it to pay any lien adjudicated against the vessel plus damages for its detention. On August 13, 1957, the attorney for Maria Trading, who had kept in touch with the controversy, having heard of the impleading petition and supposing that it had already been filed, entered the case on Maria Trading's behalf and filed exceptions to the original libel in which Maria Trading was described as an 'impleaded respondent' and it was alleged that Savas was not entitled to a lien upon the vessel since he had acted throughout as the representative of the owner. It was also alleged that the $25,000 claimed by Savas in his libel was not an obligation of Maria Trading but had been paid by him to secure an interest in the vessel. In these exceptions Maria Trading made no objection to the jurisdiction of the court.
 
 
 15
 A few days later, on August 16, Associated Bulk filed its impleading petition, together with a cross-libel against Maria Trading, claiming that Maria Trading was obligated to pay any lien claims decreed against the vessel, together with damages for the detention. Process against Maria Trading was issued under the cross-libel and served on the attorney for Maria Trading but not on the corporation itself. On August 30, 1957, Maria Trading filed exceptions to the cross-libel of Associated Bulk, raising the point that it had not been served with process and that it was therefore not subject to a decree in personam. On September 16, 1657, Maria Trading filed an answer to the original libel in which it again described itself as an 'impleaded respondent' and, without objection to the jurisdiction of the court, denied material allegations of the libel and prayed that it be dismissed. Subsequently, on October 17, the libellant, with the consent of the court, filed an amended libel wherein it named the Maria Trading Corporation as an in personam respondent and to this amended libel the Maria Trading Corporation filed exceptions to the jurisdiction of the court and an answer in which it adopted the allegations of its answer to the original libel.
 
 
 16
 The question in this state of the pleadings is whether the district court had jurisdiction to enter an in personam decree against Maria Trading Corporation in favor of Savas and the Associated Bulk Cargo. It has been held in a number of decisions that the appearance of the owner of a vessel in answer to a libel in rem, in order to defend the res, does not give the court jurisdiction to render a personal judgment against the owner. The Ethel, 5 Cir., 66 F. 340; The Berkeley, D.C.E.D.S.C., 58 F. 920; The Chickie, 3 Cir., 141 F.2d 80, 85; Logue Stevedoring Corp. v. Dalzellance, 2 Cir., 198 F.2d 369. On the other hand, in cases in which a libel in rem has been filed and the ship released upon the filing of a bond which turns out to be insufficient to cover the damages incurred, the Libellant has been allowed to amend the libel so as to increase the claim for damages and obtain a decree in personam against the claimant for the excess. See The Minnetonka, 2 Cir., 146 F. 509; The Fairisle, D.C.Md., 76 F.Supp. 27, 29, affirmed Waterman S.S. Corporation v. Dean, 4 Cir., 171 F.2d 408. This holding has been approved in Mosher v. Tate, 9 Cir., 182 F.2d 475, 479, and Logue Stevedoring Corp. v. Dalzellance, supra. See the comment in Gilmore and Black, The Law of Admiralty, page 654, and 64 Harvard L.R. 164.
 
 
 17
 There is much to be said for the amelioration of the strict rule which permits the claimant of a vessel to resist the imposition of a lien without subjecting himself to a decree in personam; and this is particularly true when all the parties are before the court so that all questions in controversy can be settled in one case. In the instant suit there is an especial reason for holding that Maria Trading subjected itself to the general jurisdiction of the court. It will have been noticed that without making any jurisdictional reservation it came into the case to file exceptions to the original libel, having notice that an impleading petition had been or was about to be filed against it. At that time it had no interest in the ship since she had been sold to the Associated Bulk Cargo, but it knew that Associated Bulk was seeking a personal judgment against it on its warranty of title in the sale of the vessel. Its only purpose in becoming a party to the suit was to secure an adjudication relieving it from personal liability. We think that under these circumstances it submitted itself to the jurisdiction of the court and cannot escape liability through its subsequent jurisdictional exceptions to the cross-libel of Associated Bulk and to the amended libel of Savas. Even if it was not validly served with process it should not be heard to say that the court had the power to decide in its favor but no power to render a decree against it. It subjected itself to the general rule that a litigant who seeks action by the court without objecting to the jurisdiction thereby makes a general appearance and subjects itself to the court's power. See Norfolk-Southern Rwy. v. Foreman, 4 Cir., 244 F. 353, 355, 358. Whatever be the proper rule as to the power of the court to impose personal liability upon the owner of a ship who comes into a case merely to resist a lien upon his property, there is no good reason to extend the immunity to one who no longer owns the vessel but merely seeks relief from personal liability. As was said in The Minnetonka, 2 Cir., 146 F. 509, 515, a court of admiralty has broad powers akin to those of a court of equity and should not be hampered in its efforts to do substantial justice in a case, after the litigants have been heard, by resort to inexorable rules of pleading.
 
 
 18
 Affirmed.